Sharif **STINSON**, et al., Plaintiffs,

v.

The **CITY OF NEW YORK**, et al., Defendants.

10 Civ. 4228 (RWS)

United States District Court, S.D. New York.

Signed June 3, 2017

Filed 06/12/2017

COHEN & FITCH LLP, 233 Broadway, Suite 1800, New York, NY 10279, By: Gerald M. Cohen, Esq., Joshua P. Fitch, Esq., THE LAW OFFICES OF JON L. NORINSBERG PLLC, 225 Broadway, Suite 2700, New York, NY 10007, By: Jon L. Norisberg, Esq., QUINN EMANUEL URQUHART & SULLIVAN, LLP, 51 Madison Avenue, New York, NY 10010, By: Stephen Neuwirth, Esq., Elinor C. Sutton, Esq., Attorneys for Plaintiffs.

ZACHARY W. CARTER, Corporation Counsel of the City of New York, 100 Church Street, New York, NY 10007, By: Rachel Seligman Weiss, Esq., Attorney for Defendants.

## OPINION

Sweet, D.J.

This civil rights class action is the paradigm of change and progress achievable in a society undergirded by the rule of law.

Skilled and dedicated counsel for the parties, aided by a highly experienced and pragmatic mediator, have reached a resolution benefitting all concerned. The strongly held positions, vigorously litigated and, initially, diametrically opposed, have been illuminated by facts developed in the discovery process and resolved. Thanks to the skill of those involved and a concerned administration, those injured will be compensated, police procedures will be clarified and strengthened, and the rights of all citizens will be fortified through what has been represented as the largest settlement of Fourth Amendment claims in New York City history.

To that end, named Plaintiffs Sharif Stinson, Ryburn Walkes, Gary Shaw, Michael Bennett, Chanel Meausa, David Thomson, Jeremy Thames, Leander Griffin, Ricardo Jones, and Victor Breland (collectively, "Class Representatives" or "Plaintiffs"), on behalf of themselves and the Class[1], have moved for orders (i) granting final approval of the proposed settlement (the "Settlement") with the City of New York ("NYC"), Raymond Kelly ("Kelly"), the former Commissioner of the New York Police Department ("NYPD"), and unnamed New York City Police Officers (collectively, "Defendants"); (ii) the award of service payments to the Class Representatives; and (iii) the granting of attorneys' fees and expenses. For the reasons set forth below, Plaintiffs' motion is granted.

## I. Prior Proceedings

The procedural history and factual background of this lengthy and intensely litigated class action has been set forth in prior opinions by this Court. See e.g., Stinson v. City of N.Y., 282 F.R.D. 360, 364–67

---

1. The Class is represented by Cohen & Fitch, LLP, Jon L. Norinsberg, Esq., and Quinn Emanuel Urquhart & Sullivan LLP (hereinafter, the "Class Counsel").

(S.D.N.Y. 2012) (laying out of the allegations and factual background of the case); Stinson v. City of N.Y., No. 10 Civ. 4228, 2015 WL 4610422 (S.D.N.Y. July 23, 2015) (detailing stages of the discovery process); Stinson v. City of N.Y., No. 10 Civ. 4228, 2016 WL 817445 (S.D.N.Y. Feb. 24, 2016) (describing multiple motions to unseal). Familiarity with this case's general background is assumed.

The instant action concerns hundreds of thousands of New Yorkers who, over the course of many years, were issued summonses later dismissed after a finding of facial insufficiency or were ticketed without probable cause. The Plaintiff Class is defined as "the Class Representatives and all other individuals who were issued C Summonses by the NYPD that were later dismissed upon a judicial finding of facial or legal insufficiency by the court prior to trial, and whose C Summonses were issued without probable cause during the Class Period [May 25, 2007 through January 24, 2017]." (Declaration of Gerald M. Cohen dated April 14, 2017 ("Cohen Decl."), Ex. D at ¶ 1.32, Dkt. 327); see also Stinson, 282 F.R.D. at 363 (defining and certifying class).

During 2015 and 2016, the parties met with retired Southern District of New York District Judge John S. Martin to meditate and try to reach a settlement. The first full-day mediation session in August 2015 was unsuccessful. (Pls.' Mem. in Supp. at 7–8.) After an additional year of discovery and motion practice, the parties engaged Judge Martin for a series of meditation sessions throughout August 2016. (Id.) These sessions culminated on August 22, 2016 with an agreement between the parties as to a final Class Fund figure and general outline of remedial measured to be taken by the NYPD. (Pls.' Mem. in Supp.

at 8.) Subsequent meetings, often with assistance from Judge Martin, resulted in determining proposed amounts for attorneys' fees, expense reimbursements, the notice and proof of claims language, and claims procedures. (Pls.' Mem. in Supp. at 9.)

On January 23, 2017, both parties requested preliminary approval of the Settlement, notice plan, and appointment of Rust Consulting as the Settlement claims administrator. (Dkt. 319.) The Court granted preliminary approval of the proposed Settlement on January 24, 2017, (Dkt. 320), which was amended with approval on January 30, 2017, (Dkt. 322).

The proposed Settlement contains both monetary and non-monetary benefits to the Class. Within seventy-five days of the Settlement's final approval, NYC will create a fund for the Class that will contain $56.5 million (the "Class Fund"), from which any service awards for Class Representatives and expense costs in the administration of the Class Fund would be drawn.[2] (Cohen Decl., Ex. D at ¶¶ 5.1, 6.4, 6.5.) The remaining Class Fund will be distributed *pro rata* to eligible claimants on a per summons incident basis with a maximum payout of $150 per summons. (Cohen Decl., Ex. D at ¶ 7.2.) A separate and additional $18.5 million is to be paid to Class Counsel by NYC for attorneys' fees and expense. (Cohen Decl., Ex. D at ¶ 5.1.)

In addition, the NYPD has stated that within three to twelve months of the Settlement's final approval, the NYPD will undertake remedial measures related to quotas, including: sending Department-wide communications informing officers that quotas and other numeric measures of performance are improper and subject to investigation by the NYPD's Internal Af-

---

**2.** Class Counsel has represented that administrative costs are estimated to be between 1.35 and 1.5 million dollars. (Pls.' Mem. in Supp. at 22 n.8.)

fairs Bureau; revising the training new NYPD recruits receive with regard to quotas and teaching recruits how to report observed issues without fear of reprisal; and improving public relations by simplifying the process for individuals who receive summons to identify officers responsible and for voicing complaints about summons if individuals believe the summons was issued unfairly.[3] (Cohen Decl., Ex. D at 6–8.)

Following preliminary approval, a total of 922,316 copies of the Notice and Proof of Claim ("Notices") were mailed to potential Class members after reviewing records provided by the New York Office of Court Administration. (Cohen Decl., Ex. F.) At the time of the Fairness Hearing, five objections had been filed and thirty individuals had opted-out of the Settlement.[4] (Fairness Hr'g Tr. 48:9–10, May 24, 2017.)

On April 14, 2017, Plaintiffs moved for final approval of the Settlement, service payments to Class Representatives, and granting of attorneys' fees and expenses. (Dkt. 324.) On May 24, 2017, a Fairness Hearing was held pursuant to Fed. R. Civ. P. 23(e)(2), at which time counsel from both sides spoke, objections to the proposed Settlement were heard, and the motion was marked fully submitted.

## II. Applicable Standard

 Federal Rule of Civil Procedure 23(e) provides that "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The Court may approve a settlement "only after a hearing and on finding that the settlement ... is fair, reasonable, and adequate." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C., 504 F.3d 229, 247 (2d Cir. 2007) (quoting Fed. R. Civ. P. 23(e)(1)(C)). To determine whether a settlement is fair, reasonable, and adequate, the Second Circuit instructs district courts to examine "the negotiating process leading up to the settlement, i.e., procedural fairness, as well as the settlement's substantive terms, i.e., substantive fairness." McReynolds v. Richards–Cantave, 588 F.3d 790, 803–04 (2d Cir. 2009) (quoting D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001)) (internal quotation marks and alternations omitted). Underlying the court's analysis is a "strong judicial policy in favor of settlements, particularly in the class action context." Wal–Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005) (citations omitted).

## III. The Proposed Settlement is Approved

### i. The Settlement is Procedurally Fair

 There is a presumption of fairness when settlements are "reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." Wal–Mart Stores, Inc., 396 F.3d at 116 (citation omitted). This presumption is well-grounded here. The parties are represented by competent, experienced counsel who engaged in over six years of discovery and contentious motion practice, addressing matters both before this Court and the Second Circuit. See

---

**3.** These are in addition to a number of other remedial steps that the NYC and NYPD have undertaken since the start of the instant lawsuit, including passing laws that expand the use of civil summons versus C–Summons and custodial arrests, amending the NYPD forms for writing and issuing summons to include more narrative space, providing regular summons issuance data to increase NYPD transparency, and revising internal NYPD officer patrol procedures and training on investigative encounters. (Cohen Decl., Ex. D at 3–6.)

**4.** Objections to the proposed Class Settlement are discussed in greater detail at Section III(ii)(2), infra.

Stinson, 282 F.R.D. at 371–72; (discussing the litigation experience of Plaintiffs' counsel); (Pls.' Mem. in Supp. at 5–7). The proposed Settlement was only reached at the tail-end of discovery and on the eve of summary judgment, after multiple arm's-length mediation sessions with Judge Martin, all of which further supports finding procedural fairness in the process. (See Cohen Decl., Ex. E at 2; Pls.' Mem. in Supp. at 7–8, 25.) Accordingly, the proposed Settlement is procedurally fair.

ii. The Settlement is Substantively Fair

■ In the Second Circuit, substantive fairness is evaluated by considering the nine factors set forth in City of Detroit v. Grinnell Corp.:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000).

■ As set forth below, eight of the nine of the Grinnell factors weigh, in varying degrees, in favor of approval of the Settlement, and none weigh against. Accordingly, the proposed Settlement is substantively fair.

1. Complexity, Expense, and Likely Duration of the Litigation

The difficulties presented in this case were legion. The claims in the lawsuit covered a decade's worth of NYPD issued summons and arrest quotas from ninety-eight different police precincts across NYC. The Settlement was preceded by intense fact discovery, involving the production and examination of hundreds of thousands of documents and thousands of hours of audio visual materials. Forty-four depositions were conducted. Class certification was challenged four times over six years and, had settlement not been reached, it is reasonable to expect that there would have been many more substantive motions leading up to a likely trial of Plaintiffs' claims, all of which would have been expensive. Accordingly, the first Grinnell factor supports approval of the proposed Settlement.

2. Reaction of the Class to the Settlement

■ "It is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 909 F.Supp.2d 259, 266 (S.D.N.Y. 2012) (quoting In re Am. Bank Note Holographics, Inc., 127 F.Supp.2d 418, 425 (S.D.N.Y. 2001)).

A total of 922,316 Notices were sent to potential class members. As of May 14, 2017, 39,094 class members have submitted claim forms, and the claim period window remains open until September 6, 2017. (Defs.' Ltr. of May 19, 2017, Dkt. 334) During the Fairness Hearing, Class Counsel represented to the Court that there have been only 30 requests for exclusion. (Fairness Hr'g Tr. 48:3–4.)

Defendants have argued, both in response to the instant motion and during the Fairness Hearing, that the number of

undeliverable Notices—represented to the Court during the hearing as approximately 276,000 Notices (Fairness Hr'g Tr. 52:6)—and the Class' low response rate should forestall the Court's final approval of the Settlement and permit more time to opt-out, (see Defs.' Ltr. of May 19, 2017). The present difficulty in reaching approximately 30% of the potential Class members may be offset by the undertaking of the parties to run an additional advertising campaign in major New York newspapers throughout the summer, particularly targeting publications popular in neighborhoods where summons tended to be issued. (See Fairness Hr'g Tr. 55:3–22.)

■ Ultimately, though, the Notice mailing was sufficient to comply with the requirements of Rule 23. "[N]otice by mail sent to the last known address of the absent class member meets the due process requirement of notice through 'reasonable effort' even where numerous class members have since changed addresses and do not receive notice." In re Prudential Sec. Inc. Ltd. P'ships Litig., 164 F.R.D. 362 (S.D.N.Y. 1996) (collecting cases); see also Gonzalez v. City of N.Y., 396 F.Supp.2d 411, 418 (S.D.N.Y. 2005) (finding that individual mailings reaching only one-third of the potential class, even without supplemental newspaper publications, constituted adequate notice). It is not wholly surprising that a sizeable percentage of the Notices were undeliverable. Given the breadth of time covered by the claim period, and the probability of many potential Class members to have moved and changed addresses, the resultant undeliverable rate does not render the Settlement unfair. See In re W. Union Money Transfer Litig., No. 01 Civ. 0335 (CPS), 2004 WL 3709932, at *14 (E.D.N.Y. Oct. 19, 2004) (approving a settlement as fair where undeliverable rate was 45% because of the "the length of the class period, the size and the mobility of the Settlement Class, and the likelihood that some name and address information may not have been accurately provided or entered at the time").

Contrary to the position of Defendants, it is neither improper nor premature for the Court to rule on the fairness of the Settlement at present based on the current response of the Class. While only a small percentage of Class members have made claims, that number may increase in the coming months. It is the "absence of significant exclusion[s] or objection[s]" that courts in this Circuit regularly consider, not low response rates. In re Bear Stearns, 909 F.Supp.2d at 267 (citing Grant v. Bethlehem Steel Corp., 823 F.2d 20, 24 (2d Cir. 1987)); see also Jermyn v. Best Buy Stores, L.P., No. 08 Civ. 214 (CM), 2012 WL 2505644, at *6 (S.D.N.Y. June 27, 2012) (quoting Sylvester v. CIGNA Corp., 369 F.Supp.2d 34, 52 (D. Me. 2005)) (observing that " 'claims made' settlements regularly yield response rates of 10 percent or less").

While on occasion courts wait until the close of the claims deadline to determine the fairness of a settlement, the reverse is neither unprecedented, see Lee v. Ocwen Loan Servicing, LLC, No. 14 Civ. 60649 (JG), 2015 WL 5449813, at *23 (S.D. Fla. Sept. 14, 2015) (collecting cases), nor unfounded in the present circumstance, where even Defendants concede that the "terms of the settlement are fair," (Defs.' Ltr. of May 19, 2017). Delay in approving the Settlement delays the Settlement's many positive provisions and prevents the tens of thousands of wronged Class members who are already claimants from receiving just compensation from the as-yet created Class Fund. (See Cohen Decl., Ex. D at 17.) Delay also prolongs the period before the NYPD is required to implement changes to the NYPD's recruit training, its

internal reporting protocol, and its officer patrol guidance. (See Cohen Decl., Ex. D at 6–8.) Approval permits these substantive remedies and valuable reforms to begin.

Five objections were filed prior to the Fairness Hearing. Three objections were letters from claimants: Glenn Johnson, Boisey Caldwell, and Jason Montague. (See Cohen Decl., Ex. G; Pls.' Ltr: of May 23, 2017, Ex. A, Dkt. 337.) Mr. Johnson's letter objects to the Settlement's payment of $150 maximum per summons, which he believes is an insufficiently small amount. Mr. Caldwell's letter, if construed as an objection, expresses similar discontent regarding the size of the settlement amount payout.[5] Mr. Montague's letter objects to the need to receive payout from the NYPD for what he terms "a mild inconvenience." (Pls.' Ltr. of May 23, 2017, Ex. A.) To the extent that the handful of objections made based on this issue are grounded in claims actually covered by the Settlement, they do not constitute a basis to reject the Settlement. Given the degree of injury inherent in improperly receiving a summons, on average about five to ten minutes during which time the summons was written up while the Class member simply had to wait, damages of $150 per summons is sufficient to find that portion of the Settlement fair. See, e.g., Watson v. United States, 179 F.Supp.3d 251, 281 (E.D.N.Y. 2016) (accepting damages of $83 an hour for "loss of liberty" claim).

Two objections, while differing slightly, both fundamentally focus on the "Released Claims" language of the Settlement. (See Cohen Decl., Ex. D at ¶ 1.28.) One objection was made by attorney Jeffrey Rothman ("Rothman") on behalf of some of his clients; one objection was made by the firms Stecklow & Thompson and Wolf Haldenstein Adler Freeman & Herz LLP on behalf of their clients in a separate litigation, Packard v. City of N.Y., 1:15 Civ. 7130 (S.D.N.Y. 2015) ("Packard"). Both provided both written submissions and made oral argument at the Fairness Hearing. Rothman objects that the release language has the potential to release Class members' other claims that stem from the issuance of improper summonses, even if those derivative claims are substantially more serious, such as claims for excessive force by the NYPD. (See Fairness Hr'g Tr. 3:21–6:1.) Packard objects that the release language might release claims by potential class members of their yet-uncertified class action against the NYPD based on arrests made during the Occupy Wall Street first anniversary, during which some potential Packard class members might have received summons. (See Fairness Hr'g Tr. 8:3–12:21.) Rothman requests that the release language be removed; Packard requests a carve-out be included in the language for their nascent class action. Rothman and Packard claim they have standing to object because some of their clients are potential Class members covered by the instant Settlement.

 As a threshold matter, it is not apparent that either Rothman or Packard have standing to object. Only a "class member may object to the [settlement] proposal," Fed. R. Civ. P. 23(e)(5), which implies that "[o]bjectors who are non-Class members lack standing to object to . . . the settlement." In re Drexel Burnham Lambert Grp., Inc., 130 B.R. 910, 923 & n.8 (S.D.N.Y. 1991) (collecting cases); see also Cent. States Se. & Sw. Areas Health, 504 F.3d at 244 ("Nonparties to a settlement generally do not have standing to object to

---

**5.** Several individuals who spoke at the Fairness Hearing also expressed discontent at the size of the Settlement amount, similar to the letters of Messrs. Johnson and Caldwell. (See, e.g., Fairness Hr'g Tr. 13:1–6, 15:10, 23:18.)

a settlement of a class action."). Rothman contends that he has clients who are members of the instant Class, but the only clients he has identified he also states have opted out. (See Rothman Ltr. of Apr. 24, 2017 at 3 & n.3, Dkt. 330; Fairness Hr'g Tr. 67:19–24; Pls.' Mem. in Resp. to Objections at 2 n.1, Dkt. 335.) Class members who opt-out of the settlement extinguish their ability to object to it and those objections need not be considered. See, e.g., People United for Children, Inc. v. City of N.Y., No. 99 Civ. 648 (KTD), 2007 WL 582720, at *3 (S.D.N.Y. Feb. 26, 2007). Packard states that, of their potential class members, "[s]ome may have been issued summonses," but have not identified any particular individual shown to be a class member of the instant action. (Fairness Hr'g Tr. 10:21; see also Fairness Hr'g Tr. 63:20–21.) In all likelihood, this renders both objectors non-parties. Nevertheless, the breadth of the release claim language is a legitimate concern for the Class and these objectors attended the Fairness Hearing alleging to represent Class members. See United States v. N.Y., No. 13 Civ. 4165 (NGG) (MDG), 2014 WL 1028982, at *10 (E.D.N.Y. Mar. 17, 2014) (considering objections when possible non-party merely "claim[ed]" to include class members, even when objectors failed to attend Fairness Hearing).

Rothman's concern about the Settlement extinguishing potential claims derivative to improperly issued summons is based principally on language from the Notice, not the release language of the Settlement, which unlike the Notice does not mention particular causes of action to be released by the Settlement. (See Rothman Ltr. of Apr. 24, 2017 at 1–2, Dkt. 330; Fairness Hr'g Tr. 65:17–66:1.) Some of Rothman's concerns were sufficiently resolved at the Fairness Hearing, during which the parties stipulated that the Settlement's release language was not to include claims for excessive force. (Fairness Hr'g Tr. 69:4–12, 72:23–25.) However, insofar as the release language states that it releases claims "based upon or arising out the same transaction, series of connected transactions, occurrences or nucleus of operative facts that form the basis of the claims that were or could have been asserted in the [instant] Civil Action," both Rothman and Packard's concern remain outstanding: some potential claims connected to issued summonses encompassed by the instant Settlement could be released if the Settlement is approved. (Cohen Decl., Ex. D ¶ 1.28.) Defendants conceded as much during the Fairness Hearing, stating that, "If there was something that was factually similar to the summons charge, then there may be an argument that [a class member] cannot recover damages for the arrest based on the release language." (Fairness Hr'g Tr. 45:10–15.)

"May" is the correct and operative word here: the thrust of these objections is a hypothetical exercise. The Settlement's release language does not, by its terms, release any class member's claims of constitutional violation, even if such claims were connected in some way to the issuance of a summons otherwise resolved by the instant Settlement. As Class Counsel stated during the Fairness Hearing, this Settlement is narrowly about "the improper Fourth Amendment violation of improper seizure of individuals.... [T]o the extent that someone has a claim outside that, this would not prevent that individual from bringing that claim." (Fairness Hr'g Tr. 39:6–15.) To argue otherwise, while perhaps not impossible, would be attenuated, and is an argument for another day.

Given the hypothetical nature of the objections, foreclosed in part by the oral stipulation of the parties and their constraining language at the Fairness Hearing, these objections are noted but do not

weigh against approving a Settlement that even the objectors acknowledge obtains "a very significant public good." (Rothman Ltr. of Apr. 24, 2017 at 1); see also In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242, 247–48 (2d Cir. 2011) (citing Wal–Mart Stores, 396 F.3d at 106) ("Parties often reach broad settlement agreements encompassing claims not presented in the complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle.")

In sum, the Court does not find the Notice procedure, presently low claims rate, or objections to show a negative Class reaction to the Settlement. Rather, the overall low number of objections and requests for exclusion, in the context of the hundreds of thousands of Notices already delivered, is itself a positive indication of general approval. See Grant, 823 F.2d at 24 (finding an otherwise fair settlement should be approved even when 36% of the total class was in opposition); Wright v. Stern, 553 F.Supp.2d 337, 344–45 (S.D.N.Y. 2008) (holding that "[t]he fact that the vast majority of class members neither objected nor opted out is a strong indication" of fairness). The objections raised are thoughtful, appreciated, and give the Court pause, but ultimately this Grinnell factor leans in favor of approval.

### 3. Stage of Proceedings and Amount of Discovery

"In considering this factor, the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." In re Bear Stearns, 909 F.Supp.2d at 267 (quot-

ing In re IMAX Sec. Litig., 283 F.R.D. 178, 190 (S.D.N.Y. 2012)) (internal quotation marks omitted). Here, the parties reached the Settlement after years of discovery, depositions, extensive motion practice, and arguments before this Court and the Second Circuit. At this "advanced stage," the parties were in a position to evaluate intelligently their claims and defenses and to negotiate a fairly valued settlement. In re Marsh ERISA Litig., 265 F.R.D. 128, 139 (S.D.N.Y. 2010) (finding the stage of the proceeding "strongly" favored approval when counsel had "reviewed millions of pages of documents, participated in 100 depositions, exchanged expert reports and rebuttal reports, and fully briefed the issue of class certification"). This Grinnell factor greatly weighs in favor of approval.

### 4. Risks of Establishing Liability and Damages

"Litigation inherently involved risk," and had this class action advanced to trial, it would have been no exception. In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 126 (S.D.N.Y. 1997). This was a wide-reaching, complicated civil rights that would have presented Plaintiffs significant obstacles at trial. First, Plaintiffs needed to establish municipal liability by proving the existence of an official NYPD policy, pattern, or practice that required officers to issue summonses regardless of probable cause to meet a minimum quota requirement established by the Department or face punishment. Plaintiffs then needed to show that such a policy resulted in violations of their constitutional rights. Given the breadth of summonses issued over the span of a decade, across almost one hundred precincts, and by countless different police officers, proving their case would have indeed been "a difficult task." Gentile v. Cnty. of Suffolk, 129 F.R.D. 435,

444 (E.D.N.Y. 1990) (citing Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). Establishing damages would have been no easier, as putting a value on the violation of one's constitutional rights is "necessarily [an] arbitrary and unprovable" endeavor. Raysor v. Port Auth. of N.Y. & N. J., 768 F.2d 34, 39 (2d Cir. 1985); see also Watson, 179 F.Supp.3d at 276 ("It is not possible to establish precisely the appropriate level of damages in a case such as this."). The great risks and uncertainty Plaintiffs would have faced in proving liability and establishing damages weigh these Grinnell factors strongly in favor of approval.

### 5. Risks of Maintaining the Class

Although the Court has already certified the Class, Defendants have previously tried on multiple occasions to decertify the Class, and there is no reason to believe there would not have been future attempts absent the Settlement. Settlement eliminates that potential risk, expense, and delay. This Grinnell factor leans in favor of approval.

### 6. Ability of Defendants to Withstand Greater Judgment

██ Defendants are the New York government and its municipal agents, and "the City has the ability to withstand a greater judgment." Wright v. Stern, 553 F.Supp.2d 337, 347 (S.D.N.Y. 2008). However, "a defendant is not required to 'empty its coffers' before a settlement can be found adequate." In re IMAX Sec. Litig., 283 F.R.D. 178, 191 (S.D.N.Y. 2012) (quoting In re Sony SXRD Rear Projection Television Class Action Litig., No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)). Even with a $75 million Settlement, this Grinnell factor is neutral as to approval of the Settlement.

### 7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

██ "[I]n any case there is a range of reasonableness with respect to a settlement." Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972). "The adequacy of the amount achieved in settlement may not be judged 'in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.'" In re Giant Interactive Grp., Inc. Sec. Litig., 279 F.R.D. 151, 162 (S.D.N.Y. 2011) (quoting In re Agent Orange Prod. Liab.Litig., 597 F.Supp. 740, 762 (E.D.N.Y. 1984), aff'd, 818 F.2d 145 (2d Cir. 1987)). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." Grinnell, 495 F.2d at 455 & n.2 ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.")

Given the risks possessed by both sides, the Settlement's Class Fund of $56.5 million and the many non-monetary remedial measures Defendants will take, make this Settlement fall within the bounds of reasonableness. At no point was it preordained that Plaintiffs would be able to prove either liability or damages, and given the observation by Judge Martin that "it would not have been possible for class representatives to obtain a more favorable settlement," (Cohen Decl., Ex. E at 2), there is little reason to think that Plaintiffs would have ended up with a meaningfully better award either through further negotiation or at trial. See In re Indep. Energy Holdings PLC, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *4 (S.D.N.Y. Sept.

29, 2003) ("Few cases tried before a jury result in a verdict awarding the full amount of damages claimed."). These final two Grinnell factors weigh in favor of Settlement approval.

For the foregoing reasons, the Settlement is both procedurally and substantively fair. In light of the fact that settlement of class actions is generally favored by the courts, the proposed Settlement is approved. See Wal–Mart, 396 F.3d at 116–17.

## IV. Approval of Service Awards to Class Representatives

 "Courts in this Circuit routinely award ... costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." In re Bear Stearns, 909 F.Supp.2d at 272–73 (citation omitted). Plaintiffs have requested $15,000 service awards for each of the ten Class Representatives, which totals $150,000.

The Class Representatives in this case were invested in the litigation: they exposed themselves by alleging police misconduct in their respective communities; participated in many hours of depositions over several years; and assumed the risk of incurring all Defendants' costs should the litigation have been unsuccessful. (See Pls.' Mem. in Supp. at 36.) Given the Class Representatives' personal risk and time spent in assisting the litigation, that the service awards are in line with other awards granted in the district, and no objections having been made, the requested awards are found reasonable and approved. See Roberts v. Texaco, Inc., 979 F.Supp. 185, 200–01 (S.D.N.Y. 1997) (finding that incentive awards ranged from less than $4,000 to over $50,000 based on "per-

sonal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation ..., [and] any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim").

## V. Approval of Requested Attorneys' Fees

 "The Second Circuit has authorized district courts to employ a percentage-of-the-fund method when awarding [attorneys'] fees in common fund cases, although the Circuit has encouraged district courts to cross-check the percentage fee against counsel's "lodestar" amount of hourly rate multiplied by hours spent. It bears emphasis that whether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances." In re Giant Interactive Grp., 279 F.R.D. at 163–64 (quoting Goldberger, 209 F.3d at 47, 50) (internal citation and quotation marks omitted). As a general matter, however, "the trend in this Circuit is toward the percentage method." McDaniel v. Cnty. of Schenectady, 595 F.3d 411, 417 (2d Cir. 2010).

 The six factors laid out by the Second Circuit in Goldberger "are applicable to the court's reasonableness determination whether a percentage-of-fund or lodestar approach is used." Id. at 423. The factors are: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Goldberger, 209 F.3d at 50.

■ As set forth below, all the Gold-berger factors weigh in favor of finding the requested fee award reasonable.

### 1. Time and Labor Expended by Counsel

Class Counsel and their para-professional staff have dedicated 27,753.50 hours to the instant class action. (See Pls.' Mem. in Supp. at 29; see also Declaration of Stephen Neuwirth dated Apr. 14, 2017, Ex. A, Dkt. 325 ("Neuwirth Decl."); Declaration of Jon L. Norinsberg dated Apr. 14, 2017 at ¶¶ 49–51, Ex. A, Dkt. 326 ("Norinsberg Decl."); Cohen Decl. at ¶¶ 52–61, Ex. H.) Over the years of litigation, these hours were spent engaged in the work necessary to organize and maintain a successful class action: coordinating with Class members; responding to and making motions, including successfully for Class certification; attending court appearances; engaging in discovery resulting in hundreds of thousands of produced, organized, and analyzed documents; taking and defending forty-four depositions; and participating in mediation sessions. Given the scope of this case, the time and labor spent by Class Counsel is both reasonable and weigh in favor of approval.

A lodestar cross-check confirms this view.[6] Based on their total hours worked, Class Counsel has reported an aggregated lodestar of $16,614,153.50. (Pls.' Mem. in Supp. at 29) The requested attorneys' fees thus represents a multiplier of 1.11 of the lodestar. As neither the rates billed nor the multiplier sought are outside the normal ranges regularly accepted in this district, this cross-check supports approval. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections, 522 F.3d 182, 191

(2d Cir. 2008) (stating that "a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally"); Febus v. Guardian First Funding Grp., LLC, 870 F.Supp.2d 337, 340 (S.D.N.Y. 2012) (accepting a lodestar multiplier of 2.2 as "well within the range of acceptable").

### 2. Magnitude and Complexities of Litigation

As set forth above, the issues present in the instant class action were factually vast, spanning many years and many precincts, and legally complex. See Section III(ii)(4) supra. This factor weighs in favor of approval.

### 3. Risk of Litigation

As discussed above, there were many risks in this class action, including sustaining the Class, proving municipal liability, establishing causation, and calculating damages. In addition, there is the risk attendant to when attorneys take a case on a contingency fee: for the past seven years, Class Counsel has had to dedicate resources without guarantee of compensation. When considering attorneys' fees in such circumstances, "[n]o one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success." Grinnell, 495 F.2d at 470. Taken together, the risks inherent to this lawsuit weigh toward approval.

### 4. Quality of Representation

While the Class has been represented by attorneys rightfully recognized as some of the top class action litigators in the country, (see Pls.' Mem. in Supp. at 25 (citing cases)), it is the results of this class

---

**6.** The "lodestar" is a numeric value that aims to capture the value of a firm's work over the course of a particular litigation. It is calculated by multiplying hours reasonably expended by a reasonable hourly rate.

action that evidence strongest the quality of the representation. Six years of a vigorous yet forward-moving litigation strategy, a successful Class certification, and, ultimately, a settlement for which the monetary amount is the second largest in NYC history and the non-monetary benefits could be, in the Court's view, "a game-changer" for NYC communities, all are the true testaments to the strength of the representation provided to the Class and weigh in favor of approval. (Fairness Hr'g Tr. 76:24.)

### 5. Requested Fee in Relation to the Settlement

The requested fee is 24.6% of the total Settlement, a figure that falls at the higher end of fees historically approved in civil rights class actions in this district but nevertheless lands comfortably within permissible bounds. See Trinidad v. Pret a Manger (USA) Ltd., No. 12 Civ. 6094 (PAE), 2014 WL 4670870, at *11–*12 (S.D.N.Y. Sept. 19, 2014) (collecting civil rights class action cases showing a range of award percentages from 13% to 25% and ultimately approving 25%, down from an initial request of 33%); Cronas v. Willis Grp. Holdings, Ltd., No. 06 Civ. 15295 (RMB), 2011 WL 6778490, at *6 (S.D.N.Y. Dec. 19, 2011) (awarding 21.7% in discrimination class action and noting similar historically approved ranges). Thus, this factor leans in favor of approval.

### 6. Public Policy Considerations

There is a "strong federal public policy favoring enforcement of the civil rights laws so important to the advancement of modern society." Red Bull Assocs. v. Best W. Int'l, Inc., 862 F.2d 963, 967 (2d Cir. 1988). The proposed fee award properly balances moderation with encouraging litigants to bring forward substantive and impactful cases that are crucial to enforcing our constitutional liberties. See Goldberger, 209 F.3d at 53. Accordingly, this factor weighs in favor of approval.

For the foregoing reasons, and in the absence of any objections to the proposed attorneys' fees, the request is found reasonable and approved.

## VI. Approval of Requests for Reimbursement of Expenses

"It is well-settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long they were incidental and necessary to the representation of those clients." In re Bear Stearns, 909 F.Supp.2d at 272 (citations omitted). Class Counsel have requested $374,224.19 to date in expenses. (Pls.' Mem. in Supp. at 34–35.) The list of submitted expenses include items like "deposition transcript[s]," "investigator," "online research," "data storage and document ingestion," "video deposition/videotaping," "mediation fee," and many line items that are, in different turns of phrase, related to document printing and reproduction. (Neuwirth Decl., Ex. B at 1; see also Norinsberg Decl., Ex. B; Cohen Decl., Ex. H.) "These expenses are the type for which the paying, arms' length market reimburses attorneys." Cronas, 2011 WL 6778490, at *7 (internal quotation marks and citation omitted). Moreover, there were no objections to these requests. Reimbursement for these expenses is therefore approved.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for final approval of the Settlement, award of service payments to the Class Representatives, and attorneys' fees and expenses is granted.

It is so ordered.